```
                                              ┌─────────────────────────────┐
                                              │ USDC SDNY                   │
                                              │ DOCUMENT                    │
                                              │ ELECTRONICALLY FILED        │
UNITED STATES DISTRICT COURT                  │ DOC #:_____       │
SOUTHERN DISTRICT OF NEW YORK                 │ DATE FILED:  10/8/14        │
-----------------------------------------X    └─────────────────────────────┘
```

Etan Leibovitz,

        Plaintiff,

             -against-

THE CITY OF NEW YORK, a municipal entity;
NEW YORK COUNTY DISTRICT ATTORNEY CY VANCE;
ASSISTANT DISTRICT ATTORNEY FRANCESCA
BARTOLOMEY; NYPD MANHATTAN DA SQUAD
DETECTIVE MARISA VALLE, SHIELD # 03637;
MANHATTAN DA SQUAD, RICHARD ROES  # 1-4;
NEW YORK STATE COURT ATTORNEY ALANA GARDNER;
NEW YORK STATE LEIUTENANT "JANE JOE";
NEW YORK STATE COURT OFFICERS DALEY,
SAL "DOE" (Shield# 3222), "JANE DOE" (Shield# 6382);

             Defendants.
----------------------------------------------------------------- X

**AMMENDED
VERIFIED
COMPLAINT**

Civil Action No.
<u>1:14-cv 03297-LAP</u>

**JURY TRIAL
DEMANDED**

Plaintiff, Etan Leibovitz, hereby brings this action under 42 U.S.C. § 1983 to redress his civil and legal rights, and alleges as follows:

## PRELIMINARY STATEMENT

1.  This is a civil rights action in which the plaintiff, Etan Leibovitz, seeks relief from the defendants violations of his rights secured by the Civil Rights Acts of 1871, Title 42 U.S.C. § 1983, by the United States Constitution, including its First, Fourth and Fourteenth Amendments, and by the laws and Constitution of the State of New York.

2. Plaintiff seeks compensatory and punitive damages, equity relief in the form of injunctive and declaratory relief, an award of costs, interest and pro se fees, and such other and further relief as this Court deems just and proper. This lawsuit seeks this Court's strong hand to finally put an end to the Defendants' abuse.

3. According to Black's Law Dictionary the definition of the word Court is an organ of the government, belonging to the judicial department, whose function is the application of the laws to controversies brought before it and the public administration of justice; the place where justice is judicially administered.

4. The United States Supreme Court in the following cases, *Imbler v. Pachtman,* **424 US 409 (1976)** and *Bradley v. Fisher,* **13 Wall. 335 (1872)** , respectfully established that the following "actors", prosecutors and judges, as part of the prosecutorial and judicial process have absolute immunity,  prosecutors when they are in their advocate roles and judges when they are within their jurisdiction in order to ascertain justice in the courtrooms.

5. The doctrines of absolute and qualified immunity protect public officials from tort suits for discretionary acts committed within the scope of their authority. Absolute immunity immunizes officials from suit for all official acts without regard to motive. Qualified immunity immunizes official acts only when undertaken in good faith. Both forms of immunity seek to balance the protection of private citizens' rights and the substantial social costs of imposing liability on public officials.

6. The Supreme Court described the immunity of judges as follows:

   "Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine in *Bradley v. Fisher,* 13 Wall. 335 (1872). This immunity applies even when the judge is accused of acting maliciously and corruptly, and it"..."is not for the protection or benefit of a malicious or corrupt judge, but for

the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." (Scott v. Stansfield, L.R. 3 Ex. 220, 223 (1868), quoted in Bradley v. Fisher, supra, 349, note, at 350)". "It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision making but to intimidation."   Pierson v. Ray, 386 US 547, 553-54 (1967)

7. In 1984, (Pulliam v. Allen - 466 U.S. 522 (1984)) after respondents were arrested for nonjailable misdemeanors, petitioner, a Magistrate in a Virginia county, imposed bail, and when respondents were unable to meet the bail, petitioner committed them to jail. Subsequently, respondents brought an action against petitioner in Federal District Court under 42 U.S.C. § 1983, claiming that petitioner's practice of imposing bail on persons arrested for nonjailable offenses under Virginia law and of incarcerating those persons if they could not meet the bail was unconstitutional. The court agreed and enjoined the practice, and also awarded respondents costs and attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976. Determining **that judicial immunity did not extend to injunctive relief under § 1983** and that prospective injunctive relief properly had been awarded against petitioner, the Court of Appeals affirmed the award of attorney's fees.

8. In 1996, Congress nullified the Courts decision in Pulliam v. Allen - 466 U.S. 522 (1984) when they passed FCIA which amended 42 U.S.C. § 1983, to extend the reach of judicial immunity to injunctive relief as well as to damages, and to preclude costs and attorney's fees in suits against the judiciary. As a result of FCIA, the doctrine of absolute judicial immunity was once again reinstated.

9. The Supreme Court described prosecutorial immunity in *Malley, 475 U.S. at 342*:

> "These cases make it clear that the absolute immunity that protects
> the prosecutor's role as an advocate is not grounded in any special
> esteem for those who perform these functions, and certainly not
> from a desire to shield abuses of office, but because any lesser
> degree of immunity could impair the judicial process itself."

10. Prosecutors at all levels of the criminal justice system enjoy this absolute immunity from lawsuits. It's a sweeping bit of judge-made law that essentially shields them from any civil liability for even egregiously bad behavior, even when said behavior results in a wrongful convictions.

11. The theory in support of absolute immunity for prosecutors holds that if prosecutors can be subjected to lawsuits for the decisions they make, they may start second-guessing themselves and become reluctant to file charges except in only the most open-and-shut cases. As the Supreme Court put it, the policy is "a balance of evils" and it is "better to leave underdressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."

12. The main problem with absolute immunity for prosecutors is the incentives it creates. The problems with shielding a public servant in whom we grant the enormous powers granted to prosecutors should be pretty self-evident. Now consider that nearly every professional incentive (reelection, promotions, election to higher office, high-paying jobs at white-shoe law firms) points prosecutors toward procuring as many convictions as possible, and that courts and bar organizations are notoriously lax at sanctioning misconduct. You get a system that not only fails to sanction bad behavior, but also often rewards it. If the old Lord Acton's axiom is true — that power corrupts, and absolute power corrupts absolutely — enormous power with no accountability can be enormously destructive.

13. Over the years, the U.S. Supreme Court has carved out a few exceptions to absolute immunity with regards to prosecutors: In *Kalina, v. Fletcher*, **522 U.S. 118; 118 S. Ct. 502** (1) a

prosecutor's conduct in making allegedly false statements of fact in a certification for determination of probable cause is not protected by the doctrine of absolute prosecutorial immunity, as the prosecutor, in making such a certification, performs a function of a complaining witness rather than an advocate; and (2) thus, Title 42 § 1983 may, under some circumstances, provide a damages remedy against such a prosecutor.  In *Burns,* the provision of legal advice to the police during their pretrial investigation of the facts was protected only by qualified, rather than absolute, immunity. *500 U.S. at 492-496.* In *Buckley,* the prosecutor was not acting as an advocate either when he held a press conference, *509 U.S. at 276-278*, or when he allegedly fabricated evidence concerning an unsolved crime.

14. In New York State, if one grants the following aforementioned actors absolute immunity,  the counterbalance in order to maintain accountability, prevention of abuse of power and most importantly  for  justice to prevail in our courtrooms,  has to come from  the  NYS Commission for Judicial Conduct in order to police judges  and Judicial Department- Departmental Disciplinary Committee in order to police lawyers.

15. The NYS Commission for Judicial Conduct in their 2014 Annual Report states that "The number of complaints received annually by the Commission in the past 10 years has substantially increased compared to the first two decades of the Commission's existence."

16. In May of 2014, two lawmakers, Sen. John DeFrancisco and Assemblyman Nick Perry were seeking support for their bill to create the first-ever commission to investigate complaints about prosecutors, as it made its way through the Senate.  Their bill (S.6286/A.8634) would create the first statewide Commission on Prosecutorial Conduct in the nation. The commission would be charged with investigating complaints against prosecutors and according to DeFrancisco, R- Syracuse, would possess a power ranging from censure to recommendation of removal. Upon recommendation from the commission to remove a prosecutor from his or her position, the state Court of Appeals would review evidence and make the ultimate decision.

    "This may seem radical at this stage, but major changes sometimes do seem radical," DeFrancisco said at a press conference to bring attention to the bill.

17. Both DeFrancisco and Perry, D-Brooklyn, stressed the bill is not an attack on prosecutors in light of recent investigations into wrong-doers in the Legislature. The legislators likened the new commission to the Commission on Judicial Conduct created in1975 which, according to Steve Downs, former chief investigator for the Commission on Judicial Conduct, brought the investigation process of judges out of the court system so it could be properly conducted.

   "I think experience has taught us over the years that professional bodies trying to discipline themselves is an unworkable system," Downs said. "For 100 years prior to 1975 only 23 judges were disciplined. In the 39 years since 1975, 826 judges have been disciplined and 166 removed from office."

## PRO SE,  Advocating On One's Own Behalf Before A Court

18. More than three decades ago, in 1975, the Supreme Court of the United States held that criminal defendants have a constitutional right to refuse counsel and represent themselves in state and criminal proceedings. *Faretta v. California, 422 U.S. 806 (1975)*

19. *Pro se* legal representation means advocating on one's own behalf before a court, rather than being represented by a lawyer. This may occur in any court proceeding, whether one is the defendant or plaintiff in civil cases, and when one is a defendant in criminal cases. *Pro se* is a Latin phrase meaning "for oneself" or "on one's own behalf". This status is sometimes known as *propria persona* (abbreviated to "pro per").

20. A trial judge to whom a request to proceed pro se has been made must determine its genuineness. Therefore, when a criminal defendant asks that he be allowed to represent himself, the court must determine (i) whether the request is clear, unequivocal and timely; (ii) whether the defendant knowingly, voluntarily, and intelligently waived his right to counsel; and (iii) whether the defendant has interposed the request solely to delay the trial or has otherwise engaged in conduct tending to delay the proceedings.

21. It is well established that "a court determination that an accused lacks expertise or professional capabilities cannot justify denying the right of self-representation." *United States v. Bennett*, 539 F.2d 45, 50 (10th Cir.), *cert. denied*, 429 U.S. 925, 50 L. Ed. 2d 293, 97 S. Ct. 327 (1976). When a trial judge fears that a pro se defendant is unable to defend himself adequately, the proper course is not to deny self-representation, but instead to appoint "stand-by" counsel, who is to assist the defendant but not to assume the primary role of defense absent the defendant's request.

22. The Constitution guarantees a criminal defendant the right to proceed pro se. *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). Although the Sixth and [**14] Fourteenth Amendments guarantee the right to effective assistance of counsel, the Constitution does not force a lawyer upon a defendant. To do so is to "imprison a man in his privileges and call it the Constitution." *Faretta*, 422 U.S. at 815.

23. Unless an accused agrees to representation by counsel, the defense presented by counsel is not deemed the defense guaranteed by the Constitution, for in a very real sense it is not *the accused's* defense. *Id.* at 821.

24. As expressed by Chief Judge Brieant of the Southern District of New York,

> "... at trial, the criminal defendant is confronted with the possible loss of his liberty, his dignity and a host of other things; on this occasion above all others, he is entitled to speak freely, to control his own future and exercise his free will . . . If freely chosen, the right to go to trial without counsel is protected by Constitutional, and indeed natural, law." *Johnstone v. Kelly*, 633 F. Supp. 1245, 1248 (S.D.N.Y.), *aff'd*, 808 F.2d 214 (2d Cir. 1986), *cert. denied*, 482 U.S. 928, 96 L. Ed. 2d 699, 107 S. Ct. 3212 (1987).

25. Because an accused relinquishes many of the traditional benefits associated with the right to counsel when he decides to represent himself, he [**15] must declare his desire to proceed pro se "clearly and unequivocally," *id.* at 835, and must "knowingly and intelligently," *Johnson v. Zerbst*, 304 U.S. 458, 464-465, 82 L. Ed. 1461, 58 S. Ct. 1019, (1938), waive the right to counsel. *Id.*

26. In short, although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (citation omitted).

27. In the opinion of the United States Supreme Court in Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525 (1975), Mr. Justice Stewart in the opening paragraph states

> "The 6th and 14th Amendment of the US Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment. The clear constitutional rule has emerged from a series of cases decided here over the last 50 years. The question before us now is whether a defendant in a state criminal trial has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so. Stated another way, the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense. It is not an easy question, but we have concluded that a **State may not constitutionally do so.**"

28. The Supremacy clause, Article VI, Paragraph 2 of the United States Constitution, establishes the U.S. Constitution, federal statutes, and U.S. treaties as "the supreme law of the land". It provides that these are the highest form of law in the U.S. legal system, and mandates that all **state judges** must follow federal law when a conflict arises between federal law and either the state constitution or state law of any state.

## PARTIES

29. At all times relevant to this action, Plaintiff Etan Leibovitz (hereinafter "Plaintiff") was a resident of Queens, County, New York. He is currently a resident of Queens County, New York.

30. Defendant The City of New York ("CITY") is a municipality organized and existing under the laws of the State of New York. At all relevant times, the CITY, acting through the NYPD Manhattan DA Squad and the New York County District Attorney's Office was responsible for the policy, practice, supervision, implementation, and conduct of the Manhattan DA Squad, the New York County District Attorney's Office and was responsible for the appointment, training, supervision, and conduct of all Manhattan DA Squad, The New York County District Attorney's Office, including the defendants named in this complaint. In addition, at all relevant times, the CITY was responsible for enforcing Manhattan DA Squad, the New York County District Attorney's Office, and for ensuring that Manhattan DA Squad, the New York County District Attorney's Office obey the laws of the United States and the State of New York.

31. At all relevant times, Defendant Cy Vance ("VANCE"), was the district attorney for the New York County District Attorney's Office. At all relevant times, Defendant VANCE acted in his capacity as agent, servant, and employee of Defendant CITY, within the scope of his employment as such, and under color of state law except when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity.

32. At all relevant times, Defendant Francesca Bartolomey ("BARTOLOMEY"), was an assistant district attorney for the New York County District Attorney's Office. At all relevant times, Defendant BARTOLOMEY acted in her capacity as agent, servant, and employee of Defendant CITY, within the scope of her employment as such, and under color of state law except when alleged herein that she acted beyond her scope. She is sued in her individual and official capacity.

33. At all relevant times, Defendant Marisa Valle ("VALLE"), was a NYPD Manhattan DA Squad detective acting in the capacity as agent, servant, and employee of Defendant CITY, and within the scope of her employment as such, under color of state law except when alleged herein that

she acted beyond her scope.  She is sued in her individual and official capacity. Defendant
VALLE a) arrested the Plaintiff with an unlawful arrest warrant, b) seized the Plaintiff without
reasonable suspicion or probable cause

34. At all relevant times, Defendants "Richard Roes  #1- 4" were Manhattan DA Squad detectives
who, acting in the capacity of agents, servants, and employees of Defendant City and within the
scope of their employment as such, a) unlawfully arrested the Plaintiff with an unlawful bench
warrant/arrest warrant, b) seized the Plaintiff without reasonable suspicion or probable cause.
Plaintiff is unable to determine the names of Manhattan DA Squad detectives at this time and
thus sues them under a fictitious designation.

35. At all relevant times, Defendant Alana Gardner ("GARDNER") was a court attorney for Judge
Edwards acting in the capacity as agent, servant, and employee of New York State  and  within
the scope of her employment as such, and under color of state law except when alleged herein
that she acted beyond his scope. She is sued in her individual and official capacity

36. At all relevant times, Defendant "Jane Joe"  ("Jane Joe ") was a lieutenant in Manhattan
Criminal Court  acting in the capacity as agent, servant, and employee of New York State  and
within the scope of her employment as such, and under color of state law except when alleged
herein that she acted beyond her scope. She is sued in her individual and official capacity.
Plaintiff is unable to determine the name of the lieutenant at this time and thus is suing her under
a fictitious designation.

37. At all relevant times, Defendant DALEY was a court officer in Manhattan Criminal Court acting
in the capacity as agent, servant, and employee of New York State  and  within the scope of his
employment as such, and under color of state law except when alleged herein that he acted
beyond his scope. He is sued in his individual and official capacity.

38. At all relevant times, Defendant SAL "Doe" shield# 3222  ( "SAL Doe" ) was a court officer in
Manhattan Criminal Court  acting in the capacity as agent, servant, and employee of New York
State  and  within the scope of his  employment as such, and under color of state law except

when alleged herein that he acted beyond his scope. He is sued in his individual and official capacity. Plaintiff is unable to determine the complete name of the court officer at this time and thus is suing him under a fictitious designation.

39. At all relevant times, Defendant "Jane Doe" shield# 6382 ("Jane Doe") was a court officer in Manhattan Criminal Court acting in the capacity as agent, servant, and employee of New York State and within the scope of her employment as such, and under color of state law except when alleged herein that she acted beyond her scope. She is sued in her individual and official capacity. Plaintiff is unable to determine the name of the court officer at this time and thus is suing her under a fictitious designation.

40. At all times relevant herein, Defendant CITY employed Defendants VANCE, BARTOLOMEY, VALLE, Richard Roes # 1-4 and are referred to collectively herein as the "City Defendants".

41. At all times relevant herein, Defendants Jane Joe, Daley, Sal Doe, Jane Doe, were employed by the State and are referred to collectively herein as the "State Defendants".

42. Plaintiff reserves the right to amend this Amended Complaint after discovery reveals the true names of MANHATTAN DA SQUAD "Richard Roes" # 1-4 , NEW YORK STATE LEIUTENANT "JANE JOE" and NEW YORK STATE COURT OFFICERS SAL "DOE" (Shield# 3222), "JANE DOE" (Shield# 6382).

43. All defendants and each of them, separately and in concert, engaged in acts and / or omissions that constituted deprivations of plaintiff's constitutional rights. Though these acts were carried out under color of law, they had no justification or excuse, and were instead gratuitous, illegal, improper, malicious, willful and unrelated to any activity in which law enforcement officers, detectives, district attorneys, prosecutors, court attorneys and court officers may appropriately and legally engage in the course of criminal court procedures.

## JURISDICTION AND VENUE

44. This action is brought pursuant to the First, Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §1983, §1988, and New York state common law.

45. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a), and under 28 U.S.C. § 1367, which provides for supplemental jurisdiction over claims which arise under New York state law.

46. Venue is this District is proper under 18 U.S.C. § 1391(b) and (c) in that Defendant CITY OF NEW YORK is administratively located within the Southern District of New York, and the events giving rise to this claim occurred within the boundaries of the Southern District of New York.

47. Declaratory relief is available pursuant to 28 U.S.C. §§2201 and 2202.

## JURY TRIAL DEMANDED

48. Plaintiff demands a trial by jury on each and every one of his claims as pleaded herein.

## NOTICE OF CLAIM

49. Plaintiff timely filed a Notice of Claim with the Comptroller of the City of New York, setting forth the facts underlying Plaintiff's claim against CY VANCE, ADA FRANCESCA BARTOLOMEY and THE CITY OF NEW YORK.

50. The CITY assigned a claim number to Plaintiff's claim, and Plaintiff was subjected to an examination pursuant to N.Y Gen. Mun. L. Sec. 50-h on August 15, 2014.

51. Pursuant to New York General Municipal Law § 50-e *et seq.*, at least 30 days have elapsed since the service of notices of claim, and to date, no answer has been received by Plaintiff and no compensation has been offered by Defendant CITY in response to this claim.

52. This action has been commenced within one year and ninety days of the date of occurrence of the events giving rise to this Complaint.

53. The Plaintiff initiated a special proceeding in Supreme Court for an Order pursuant to **General Municipal Law §50-e (5), permitting the Plaintiff to file a late Notice of Claim** setting forth the facts underlying Plaintiff's claim against Defendants DETECTIVE MARISA VALLE, Richard Roes # 1-4 MANHATTAN DA SQUAD an THE CITY OF NEW YORK. [1]

## STATEMENT OF FACTS

54. On April 3rd, 2013, at 7:58pm, the Plaintiff was arrested for the first time in front of the Le Triomphe building. The Manhattan County District Attorney's Office filed a complaint No. 026141/13 charging the Plaintiff with one count each of:

(1) Aggravated harassment in the second degree;

(2) Criminal trespass in the second degree;

(3) Resisting Arrest;

(4) Harassment in the 2nd Degree.

Mr. Leibovitz remained incarcerated until the following afternoon.

55. The following day, in the midafternoon, Plaintiff's college friend, defense attorney Jason Steinberger, rushed over to criminal court to facilitate in getting the Plaintiff out from jail. The Plaintiff was arraigned on Manhattan County misdemeanor complaint No. 026141/13 on April 4th, 2013. He pled not guilty and was released on his own recognizance. Walking out from the

---

[1] Plaintiff reserves the right to amend the amended complaint once a decision is rendered.

courthouse, Mr. Steinberger looked at the Plaintiff in disbelief.    The Plaintiff's next court appearance was scheduled for May 28, 2013.

56. Between April, 2013 to May, 2013, the Plaintiff spoke to Mr. Steinberger multiple times over the phone, expressing his desire to proceed with his criminal case pro se. Mr. Steinberger advised the Plaintiff multiple times that representing oneself in court would be a grave mistake.  He left off by stating the infamous proverb, "A man who is his own lawyer has a fool for a client."

57. Upon the conclusion of their phone call, the Plaintiff took Mr. Steinberger's warning into consideration.  After careful analysis and reviewing of all the facts, including his exculpatory evidence which included the video recording of his arrest, the conversation with the doorman outside the building as well as his interaction with the police, the Plaintiff was determined to clear his name and to restore his once immaculate rap sheet.  The Plaintiff made a promise that he will acquire the legal know-how to represent himself to the best of his ability.

58. Sometime between, April 2013 to May 2013, Mr. Steinberger informed the Plaintiff that Defendant BARTOLOMEY discussed with him that if Mr. Leibovitz drops his civil lawsuit against the complaining witness she will drop his criminal charges.  The Plaintiff smiled and said to Mr. Steinberger, "What does one have to do with the other.  I have every right to sue Charles Poliacof and Robert Stepeck.  They got caught with their hands in the cookie jar and now they need to come up with lies to have me arrested.  That is never going to happen because I am going to expose the truth".

59. The Queens Supreme Court Law Library is a place where one can freely do legal research. The library has many amenities to facilitate one's legal needs. From late April until early May of 2013, the Plaintiff went practically every day to the law library to study criminal law. Using Lexis Nexis, an application that allows one to search for historical cases and other legal documents,  the Plaintiff  discovered the following case People v  Pierre-Lewis *34 Misc. 3d 703*; *927 N.Y.S.2d 592*;  *2011 N.Y. Misc. LEXIS 3642*; *2011 NY Slip Op 21254* and committed it  to memory.  Judge Alexander's well transcribed opinion on the constitutionality of Aggravated harassment in the second degree left an indelible mark on him.

**The May 28, 2013 Incident**

60. In the early morning of May 28th, 2013 in Manhattan Criminal Court, in Part B, located at 100
Centre Street, New York, in front of Judge Edwards and Defendant BARTOLOMEY, Plaintiff's
defense attorney Jason Steinberger filed an oral motion to withdraw as counsel.  Judge Edwards
freely granted Mr. Steinberger's motion.

61. At Plaintiff's first pro se application hearing, Judge Edwards inquired about Plaintiff's
educational background as well as how he knew Mr. Steinberger.

62. Black robe syndrome is a condition which is not widely known to the general public, but which
every trial lawyer in the country could describe in great detail if they were not too afraid to speak
out against judges suffering from it. It afflicts those lawyers who have reached the pinnacle of
professional status by achieving the position of judge, infecting all levels of the American
judicial system. Black robe syndrome is characterized by exhibiting three or more of the
following symptoms inflated ego and an excessive sense of self-importance, lack of empathy,
sudden outbursts of rage, refusal to effectively manage scheduling issues, belief in a double
standard when it comes to the judge's own conduct, lack of patience with inexperienced lawyers,
hostility towards lawyers more knowledgeable than the judge, inability to work efficiently, a
compulsion to waste the time of others, imperious attitude, the belief that his or her words are
dogma, an obsessive desire to be kissed on the ass. [2]

63. During Plaintiff's first pro se application hearing,  Judge Edwards broke the law and abused her
power and displayed some of the symptoms of black robe syndrome, the belief that her words are
dogma. Judge Edwards  subjectively denied Plaintiff's  first pro se application and forced Mr.
Stuart Altman, (herein "Mr. Altman") an 18B lawyer on him. The Plaintiff  was confused why
his application was denied since he stated he had a 3.78 GPA , while majoring in Biology at
SUNY Binghamton and that he became  friends with Mr. Steinberger during his college years
back in 1995.  Knowing that representing oneself pro se is a right as opposed to a privilege, the
Plaintiff once again stated respectfully, intelligently and unequivocally without any hesitation

[2] http://stubbornwriter.com/2010/03/17/09/12/11/law/black-robe-disease-why-the-abuse-of-power-is-rampant-among-judges-and-the-american-judiciary/318

that he wanted to represent himself. The Plaintiff further stated that he refused having Mr.
Altman as his attorney and that Judge Edwards was violating and interfering with his
Constitutional rights.

64. A cover-up is an attempt, whether successful or not, to conceal evidence of wrongdoing, error,
incompetence or other embarrassing information. In a passive cover-up, information is simply
not provided; in an active cover-up, deception is used. The expression is usually applied to
people in positions of authority who abuse their power to avoid or silence criticism or to deflect
guilt of wrongdoing. Those who initiate a cover-up may be responsible for a misdeed, a breach
of trust or duty or a crime.

65. When the Plaintiff stated that Judge Edwards was violating his constitutional rights, Judge
Edwards retaliated and displayed a few more symptoms of black robe syndrome, an imperious
attitude with a sudden outburst of rage. Judge Edwards  yelled "Now you listen to me. The
court has made its decision!!!" Judge Edwards then ordered the court officers to have the
Plaintiff removed.

66. According to the NYS Court Officer Trainee Manual some of the functions of a court officer is
to provide courthouse and courtroom security. Court Officers provide a safe and secure
environment for the fair and prompt resolution of all matters before the courts.  The job is a
blend of security work, public relations, law enforcement, prisoner management, and clerical
duties.  A strong sense of responsibility is necessary, as well as good judgment, patience and
impartiality.  Court Officers must not favor one party over another in a court proceeding.  They
protect and enhance the judicial process itself.   A Court Officer is usually the first person a
visitor to court will approach for information. The officer's tone and demeanor can help put
people at ease and establish confidence in the judicial process.  In their actions, Court Officers
must reflect impartiality, fairness and commitment to justice.

67. Adhering to Judge Edwards' unlawful order, the court officers, left their stationed positions and
approached the Plaintiff aggressively in order to silence and intimidate him.  That day the court

officers failed to protect and enhance the judicial process. They lacked a sense of responsibility, good judgment, patience and impartiality.   At no point was the Plaintiff a risk to anyone.  As a result, the Plaintiff walked out peacefully and warned Judge Edwards that he will see her in Federal Court one day.

68. During the Plaintiff's first pro se application hearing, the Plaintiff had two witnesses seated in the spectator's seats, Christine Liderhouse and her mother, Sue Liderhouse.

69. Between May 28, 2013 to July 24, 2013, the Plaintiff spoke to Mr.  Altman on various occasions expressing his concerns over the courts (Judge Edwards ) violating his  civil liberties, his due process and constitutional rights.  Mr. Altman nonchalantly stated "You will eventually get it (go pro se)".   The Plaintiff replied, "What does that mean my request should have been granted from day one and by eventually, Mr. Altman, When will that be?"

70. Pursuant to Article 18B of the County Law, the Assigned Counsel Plan has been providing quality legal services to indigent persons within the Bronx and New York County Criminal Courts since 1966. The Plan provides compensation to private attorneys for representing indigent clients charged with criminal offenses. Attorneys are assigned matters by the Court and the Administrator's office when a conflict exists prohibiting the institutional providers, such as The Legal Aid Society, from providing representation. Panel attorneys are screened and certified to the Panel by the Central Screening Committee. Attorneys are compensated at a rate of $60 per hour for misdemeanor matters and $75 per hour for felony matters. The Plan provides legal assistance for trial court matters as well as appellate matters.

71. *All* 18B lawyers inherently have a conflict of interest with their clients. 18B lawyers rely on their source of income from the courts and thus would never bite the hand that feeds them. Such is the case with Mr. Altman. On May 28, 2013, Mr. Altman, witnessed Judge Edwards  violate and interfere with Plaintiff's  constitutional rights, yet did nothing to defend him, nor did he report the judicial misconduct.

72. Under RULE 1.1 of NEW YORK STATE UNIFIED COURT SYSTEM PART 1200 RULES OF PROFESSIONAL CONDUCT, Competence , a lawyer should provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

73. As a result of Mr. Altman's lack of competence and failure to defend the Plaintiff's Constitutional rights and report Judge Edwards' misconduct, between mid-June to early July, 2013 the Plaintiff exercised his First Amendment right and placed an initial call to Defendant GARDNER, court attorney for Judge Edwards, at her office.

74. "A principal 'function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.' " Id. at 408-09, 109 S.Ct. 2533 (quoting Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)).

75. A conversation between Defendant GARDNER and the Plaintiff ensued for over 30 minutes. During their phone conversation the Plaintiff expressed his following concerns:
   A. Judge EDWARDS violating his due process and interfering with his constitutional rights to conduct his own defense
   B. Discussed the following case, Faretta vs California
   C. Judge EDWARDS forcing a lawyer on him
   D. Court officers being used by Judge Edwards to intimidate him

76. Under NYS Unified Court System Part 1200 Rules of Professional Conduct Rule 8.3, a lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.

77. During Defendant GARDNER and the Plaintiff's initial conversation, Defendant GARDNER spoke to the Plaintiff **freely** without any hesitation and not once threatening to hang up. Upon the conclusion of their discussion, Defendant GARDNER agreed to raise the Plaintiff's concerns

to Judge EDWARDS as well as suggested that the Plaintiff should reinstitute his pro se application at his next court appearance.

78. An omnibus motion is a type of legal motion in which multiple requests are bundled. Legal motions are an important part of legal procedure in most courts, allowing issues to be brought into the court in a systematic fashion. On or about June 12, 2013, Mr. Altman filed a standard Omnibus Motion on behalf of the Plaintiff.

**The July 24, 2013 Incident**

79. In the early morning of July 24, 2013, in Manhattan Criminal Court, Part B, a hearing was scheduled in front of Judge Edwards. Defendant BARTOLOMEY, Mr. Altman and the Plaintiff were present. At the hearing the following transpired:

    A. As a result of Mr. Altman's Omnibus motion, the PEOPLE dismissed the 2nd charge of Criminal Trespass.

    B. The PEOPLE offered the Plaintiff an ACD (Adjournment in Contemplation of Dismissal) for which the Plaintiff had absolutely no interest.

    C. Judge Edwards granted the Plaintiff several hearings (Huntley, Wade and Dunaway).

80. Before Judge Edwards was able to conclude the hearing, Mr. Altman stated he wanted to be heard on a matter. The following colloquy ensued:

**July 24, 2013 Docket# 2013NY026141  Minutes page 4 line 1- page 5 line 17**

**Mr. Altman:**    Also, I spoke to my client in this matter. He indicated on the last date he wanted to represent himself. Mr Leibovitz, he's indicated to me he wishes to tell the Court he still wishes to represent himself in this matter. However, he would like myself to be by his side during the case as for any assistance he may need. That's how he would like to proceed.

**Judge Edwards:**    This is what we discussed on the last court date, and I know it was over your objection. I did not grant your application to represent yourself.

**Plaintiff :**        That's correct

**Judge Edwards:** I'm still going to keep it the way it is.  You have an attorney.  I'm going to keep him as your representative to the Court.  I'm going to deny your application to represent yourself. Do you have a written motion?

**Plaintiff:**        No, I'd like to discuss Faretta versus California.  It's stated in a criminal trial defendants can represent themselves in a State or Federal Court.

**Judge Edwards:** It has to be approved by the Court.

**Plaintiff:**        You asked my education, gave me an exam.  I passed.  I'm an educated person.  I have a book.  I'm determined.  I have studied all the charges.

**Judge Edwards:** I can understand that, sir.  I respect your knowledge.  I don't mean to disrespect you in any way.  I don't believe you passed the examination.

**Plaintiff:**        You only asked me four questions in reference to my education. You didn't ask me any legal questions.

**Judge Edwards:** I looked at the facts of the case.  My answer is no.  My decision is you will be represented by counsel.

**Plaintiff:**        You didn't ask me any legal questions.

**Judge Edwards:**   Sir, you're not going to be representing yourself in this case. September 26 for hearing and trial.

81. Once again Judge Edwards broke the law by violating and interfering with the Plaintiff's fundamental Constitutional rights, the right to represent oneself in criminal court.  On May 28, 2013, during the Plaintiff's first pro se application, he requested that he proceed with his criminal case on his own.  On July 24, 2013, during the Plaintiff's second pro se application, he requested that he proceed with his criminal case with Mr. Altman by his side for any assistance he may need.  After both pro se application were subjectively denied, Mr. Altman, Defendant

GARDNER and Defendant BARTOLOMEY, all lawyers, had an obligation to protect the Plaintiff and report Judge Edwards's misconduct to a tribunal or the NYS Commission on Judicial Conduct but failed to do so, leaving the Plaintiff exposed to future misconduct.

82. A subpoena duces tecum is a court summons ordering the recipient to appear before the court and produce documents or other tangible evidence for use at a hearing or trial. On information and belief, on or about August 5th, 2013, Judge Edwards signed Mr. Altman's subpoena duces tecum to command "Owner and Management Le Triomphe Building" to produce by September 2, 2013 the original April 3rd, 2013 videos and recording from the lobby and the front of the building of Le Triomphe located at 245 58th Street, New York, NY 10022 .

83. On August 6th, 2013 the Plaintiff went to Queens Supreme Court law library to continue doing further research. Using Lexis Nexis, the Plaintiff did the following keyword search:
    Pro Se, criminal defendants, and constitutional rights

84. As a result of the Lexis Nexis search, the Plaintiff discovered the following case, **Wiesner v Abrams ,726 F. Supp. 912; 1989 U.S. Dist.** In Judge Dearie's opinion, in the aforesaid case, he eloquently transcribes and discusses, by siting landmark historical cases, how trial courts should conduct and handle pro se applications.

85. After carefully perusing every page of Judge Dearie's Opinion in Wiesner v Abrams as well as reviewing the opinion by Judge Alexander in People vs Pierre-Lewis, on August 7th, 2013, the Plaintiff decided it was time to stand up once again for his Constitutional (6th and 14th Amendment) rights and Due Process.

## The August 7th , 2013 Incident

86. On August 7th, 2013 the Plaintiff once again applied the principal of free speech, when he placed a call with court attorney, Defendant GARDNER, at (646) 386-4678, a public line after his second pro se application was denied. The following conversation ensued:

| | |
|---|---|
| **Plaintiff:** | Good afternoon |
| **Defendant GARDNER:** | I can't speak to you |

Plaintiff:               Why is that?
Defendant GARDNER:    You have a lawyer
Plaintiff:               I don't have a lawyer, Judge Edwards imprisoned me
to a lawyer. Why did Judge Edwards deny my request to proceed pro se, I
thought you were going to advise her as you stated from our prior conversation?
Defendant GARDNER:    I can't talk to you either way
Plaintiff:               Why because its ex-parte?
Defendant GARDNER:    Yes....
Plaintiff:               You respect Ex Parte but not the Constitution?
Let's get Francesca Bartolomey on the phone then.   This is a fucking joke.
This doesn't make any sense to me.  Can someone please do their job!!!!

Defendant GARDNER hung up.

87. A few minutes later, the Plaintiff placed his second call which resulted in Defendant GARDNER
willfully screening the call and eventually going to voicemail.

88. A third call was placed a few minutes later which resulted in Defendant GARDNER once again
willfully screening the Plaintiff's call. This time, the Plaintiff left a voicemail, stating what his
intent was with regards to making this call.  The Plaintiff stated that Judge Edwards:

        A. Needed a refresher course on the Constitution
        B. Needed to review case-law with regards to pro se protocol
        C. Needed to read the opinion from the United States Supreme Court
           case in Faretta vs California
        D. Is incompetent
        E. Needs to be reprimanded

89. During the Plaintiff's third call he expressed his dissatisfaction with Defendant GARDNER.
Defendant GARDNER, a graduate from Loyola University Of Chicago Law school, violated her
Oath of Office by not "support (ing) the constitution of the United States, and the constitution of
the State of New York...." and as a result of her failure to uphold her oath, failed to do her job
and put the Plaintiff in harm's way.  Defendant GARDNER was fully aware that Judge Edwards
twice subjectively denied the Plaintiff's pro se application. Her failure to report Judge Edwards
was in complete violation of NYS Unified Court System Part 1200 Rules of Professional
Conduct Rule 8.3 *Reporting Professional Misconduct*. Defendant GARDNER had an obligation

to the Plaintiff to uphold her oath of office but instead looked the other way in order to protect
Judge Edwards.

90. Linguistics is the scientific study of language, the study of the nature, structure and variation of
language, including phonetics, phonology, morphology, syntax, semantics, sociolinguistics and
pragmatics.  The Plaintiff's choice of words during his third call would have put a linguist in a
state of disarray. The Plaintiff's choice of profanity encompassed the whole spectrum. His tone
of voice fluctuated many times but mostly residing in the highest decibel. There was absolutely
no threat just protected speech. As a result of the court's employee's continuous violation of the
Plaintiff's due process and constitutional rights, the Plaintiff was now exuding some more
symptoms of mental anguish.

91. The Plaintiff placed his fourth call a few minutes later which resulted in him leaving yet another
voicemail.  Just like the previous message,   the Plaintiff once again used profanity to express his
dissatisfaction with Judge Edwards' and Defendant GARDNER's job performance and lack of
accountability.  As public servants they were failing the People of New York.  The Plaintiff
reiterated that his due process was being violated and that he wanted to conduct his own defense.

92. A few minutes later, a fifth call was placed, which resulted in the Plaintiff leaving yet another
voicemail. Normally, the Plaintiff would leave only one message but it's blatantly obvious that
the Court's employees were ignoring his rights. With the third message, the Plaintiff mostly
resorted to stating his complete dissatisfaction for Judge Edwards.  The Plaintiff went as far as
questioning how Judge Edwards even passed the bar exam. Once again, the Plaintiff restated his
intent which was to exercise his First Amendment right and to file grievances with the Courts
with regards to their denial of his rights to conduct his own criminal defense.

93. In the midafternoon, on August 8th, 2013, Mr. Altman and the Plaintiff had a scheduled meeting
at Mr. Altman's office located at 2 Allen St, NY, N.Y. While the Plaintiff was patiently sitting
outside Mr. Altman's office, Mr. Altman called the Plaintiff and inquired if he recently called
Judge Edwards or Defendant GARDNER. As a result of the Plaintiff's calls, Mr. Altman
informed him that the courts want to see him early tomorrow morning, at 9:30 a.m. and advised

him he shouldn't call the Courts anymore because the Courts will charge him with harassment. The meeting with Mr. Altman was canceled as a result.

94. Upon completing the phone call with Mr. Altman, the Plaintiff left Mr. Altman's office and headed to Manhattan Criminal Court, (which is located a few blocks west of Mr. Altman's office) and entered the People's Courtroom Part B, where Judge Edwards was residing. The Plaintiff approached one of the Court Officer's and handed him a copy of Judge Dearie's Opinion in Weisner v. Abrams, out of the United States District Court , **726 F. Supp. 912; 1989 U.S. Dist.** The Plaintiff politely demanded the court officer give the aforesaid papers to Judge Edwards and inform her that she has 18 hours to read it. The Plaintiff then peacefully left the courtroom and exited the courthouse.

## The August 9th , 2013 Incident

95. The following morning on August 9, 2013, Mr. Altman and the Plaintiff arrived at Manhattan Criminal Court, Part B where Judge Edwards' was residing. Judge Edwards "recused herself" and notified Mr. Altman and the Plaintiff that the Plaintiff's case (docket# 2013NY026141) was assigned today for Jury Part 6 in front of Judge Ferrara.

96. While sitting in the spectator's seats in the courtroom of Jury Part 6, Judge Ferrara asked the Plaintiff if he can speak to "his" attorney, Mr. Altman. The Plaintiff quickly corrected Judge Ferrara and responded," Mr. Altman is not my attorney I was "imprisoned" to him by Judge Edwards against my will. You can speak to him if you want.".

97. Mr. Altman and Defendant BARTOLOMEY gathered around Judge Ferrara's bench to discuss a few subject matters. On information and belief some of the subject matters were about docket# 026141 , the scheduled hearings, the trial and as Judge Ferrara stated on the record

**August 9th, 2013 Minutes page 2 line 10**

"And there's an issue as to whether or not Mr Leibovitz should be
allowed to proceed in a pro se fashion."

98. Judge Ferrara commenced the hearing by making the following statements that Judge Edwards
should have recited from inception at the Plaintiff's May 28, 2013 hearing:

**August 9th, 2013 Minutes page 2, line 25 to page 4 line 4**

**Judge Ferrara:** Do you understand that you have a constitutional right to be
represented by an attorney?

**Plaintiff:** That's correct, yeah

**Judge Ferrara:** **You also understand you can represent yourself?**

**Plaintiff:** That's correct.

**Judge Ferrara:** If you cannot afford an attorney, one can be assigned for you
without expense and obligation. And Mr. Altman has been
assigned to represent you and you will not have to pay him. Do
you understand that?

**Plaintiff:** Yes.

**Judge Ferrara:** Have you had enough time to think about this desire on your
part to proceed and represent yourself without an attorney?

**Plaintiff:** Yes, I have, more than enough time.

**Judge Ferrara:** I'm sorry?

**Plaintiff:** More than enough time.

**Judge Ferrara:** Okay Can you tell me a little bit about your educational
background?

**Plaintiff:** I graduated with a BA in biology from Binghamton
University with a 3.78 GPA.

| Judge Ferrara: | Have you ever been involved in a criminal case as a defendant? |
|---|---|
| Plaintiff: | Defendant, no. |
| Judge Ferrara: | Is this your first appearance? |
| Plaintiff: | In criminal, yes.  Never been arrested. |

99. Judge Ferrara then went over some criminal legal proceeding

    a) Jury proceedings for Misdemeanor: Jury of 6 and 2 alternates
    b) Rules of Evidence
    c) Hearsay
    d) Proper Etiquette in the courts

100.      After the discussion about the criminal legal proceeding, the Plaintiff addressed Judge Ferrara about Judge Edwards' behavior and her violating and interfering with his constitutional rights:

### August 9th, 2013 Minutes page 6 lines 1 to Page 7 line 1

| Plaintiff: | I have a question with regard to Judge Edwards' behavior, violating my constitutional rights, is there anything going to be done with regards to her action? |
|---|---|
| Judge Ferrara: | We cannot discuss that at this point, nor is it my job to advise you on this.  What I will tell you, from this point onward she will have nothing to do with the case. |
| Plaintiff: | Okay |
| Judge Ferrara: | And you will have no further communications with her or her court attorney. |
| Plaintiff: | All right |
| Judge Ferrara: | Do you understand? |
| Plaintiff:<br>Judge Ferrara: | Absolutely.<br>If you are allowed to proceed pro se, the only |

|   |   |
|---|---|
|   | communications you can have with the Court are in writing. Do you understand? |
| **Plaintiff:** | All right |
| **Judge Ferrara:** | No telephone |
| **Plaintiff:** | Once she violated my constitutional rights— |
| **Judge Ferrara:** | We are not talking about Judge Edwards. |
| **Plaintiff:** | If there is respect from the Court, I will respect the Court. |

101.    After attempting to "address Plaintiff's  concerns" with regards to Judge Edwards' behavior , Judge Ferrara then further discussed how a  trial is conducted in criminal court:

      A.  Picking a Jury
      B.  Opening Statement
      C.  Cross Examining Witnesses
      D.  Defendant's own witnesses and questioning them
      E.  Obligations as a Pro Se litigant

102.    After addressing trial procedures and  the obligations as a Pro Se Litigant,  Judge Ferrara addressed the Plaintiff's  Pro Se Application:

### August 9th, 2013 Minutes page 8 lines 20 to Page 9 line 25

| | |
|---|---|
| **Judge Ferrara:** | Do you have any questions about your obligations as a pro se litigant? |
| **Plaintiff:** | I'm good |
| **Judge Ferrara:** | I'm going to grant your application now.  Mr Altman will remain on the case as your legal advisor.  As a legal advisor he will be available to you at all times to answer your questions and advise you as to strategy.  Do you understand? |
| **Plaintiff:** | Yes |
| **Judge Ferrara:** | You will be present on all court appearances. If you seek to advance the case and your application is granted you must notify Mr Altman so he can attend. Please confer with him before you advance the case to the DA. |

**Plaintiff:**          Absolutely.

**Judge Ferrara:**  I noticed from the papers that there was a hearing and trial ordered in the case and that there will be hearings and then an immediate trial, is that right People?

**Defendant BARTOLOMEY:**  That's correct, Judge .

**Judge Ferrara:**   Okay , I'm going to put the case on for trial in Jury Part 13.

**Plaintiff:**          Okay.

**Judge Ferrara:  I 'm going to give you enough time to prepare the case.**

103.     At Plaintiff's  3rd  pro se application hearing, if one analyzes the aforesaid colloquy that took place, the following transpired:

    A. Judge Ferrara acknowledged that the Plaintiff has a right to represent himself and thus validated Judge Edwards incompetence and abuse of power.

    B. Judge Ferrara, a graduate from Columbia University Law School, violated NYS Unified Court System Part 1200 Rules of Professional Conduct  Rule 8.3 *Reporting Professional Misconduct,* by refusing to report Judge Edwards's misconduct and  instead resorted to admonishing the Plaintiff,  not to call Judge Edwards or Defendant GARDNER.  On August 7th, 2013, the Plaintiff's  behavior was protected by  his First Amendment Right and thus he should never have been admonished, penalized nor  forbidden from making any calls . In **_People_** *v. Dietze* , 75 N.Y.2d 47 (1989) speech is often "abusive" -- even vulgar, derisive, and provocative -- and yet it is still protected under the State and Federal constitutional guarantees of free expression unless it is much more than that. Casual conversation may well be "abusive" and intended to "annoy"; so, too, may be light-hearted banter or the earnest expression of personal opinion or emotion. But unless speech presents a clear and present danger of some serious substantive evil, **it may neither be forbidden nor penalized.**

C. Instead of commending the Plaintiff for standing up for his rights, Judge Ferrara applied negative punishment, an important concept in B.F. Skinner's theory of operant conditioning by punishing the Plaintiff in order to decrease the behavior that precedes it. In this case of negative punishment, it involves taking something good or desirable away ( right to call a public office)  in order to reduce the occurrence of a particular behavior.

D. Mandate is defined as  a **writ, process or other written direction**, issued pursuant to law, out of a court, or made pursuant to law, by a court, a judge or person acting as a judicial officer, and commanding a court, board or other body, or an officer or other person, named or otherwise designated therein, to do or to refrain from doing an act therein specified. On August 9th, 2013 Judge Ferrara did not issue the Plaintiff a mandate, but rather he  issued an unconstitutional **oral direction** that failed to be <u>**clear and  explicit**</u> in its terms, like duration.

104. Upon establishing his pro se status, the Plaintiff reached out to Defendant BARTOLOMEY by phone to inquire the status of his case.  Sometime between August 9th, 2013 to August 28, 2013, Defendant BARTOLOMEY returned the Plaintiff's phone call. The Plaintiff was placed on speaker so that Defendant BARTOLOMEY's coworker could be a witness to the call.  The Plaintiff requested that Defendant BARTOLOMEY fill him in with the conversations she had with his prior attorney, Jason Steinberger and Mr. Altman, the attorney that the courts forced upon him.

105. On August 14, 2013, Kenneth J Ward served Mr. Altman's subpoena duces tecum that was signed by Judge Edwards on August 5th, 2013, prior to recusing herself.

106. On August 28th, 2013,  the Plaintiff's  "legal advisor" Mr. Altman   emailed him  stating, "

> Hi Etan
>
> I was contacted by Amy Ward regarding the subpoena.
> She told me there was an error with the subpoena  and
> she would like a new one and she would comply with it.
> I told her you were handling your own case now

Her number is <u>212-835-2400</u>
Thanks
Stuart"

107.    The Plaintiff's "legal advisor" Mr. Stuart Altman further stated over the phone that he
wouldn't be able to compose another subpoena  because he was very busy with his other cases
in preparation for trial.  Mr. Altman suggested that the Plaintiff should go ahead and file the
subpoena on his own.   On August 9th , 2013, Judge Ferrara stated " If you (Mr. Leibovitz) wish
to subpoena witnesses, you will talk to Mr. Altman, I'm  authorizing Mr. Altman  to issue
subpoenas on your behalf, provided he agrees with your strategy." **(August 9th Minutes page
10).**

108.     Every second that passed meant that there was a chance the Plaintiff would lose the
opportunity to acquire his most important evidence, the building's arrest videos.  After a certain
amount of time, buildings record over their tapes.  It was now over 4 months since the Plaintiff
was first arrested.

109.    On August 28, 2013, the Plaintiff called Manhattan Criminal Court and found out that
both Mr. Schmidt, court attorney for Judge Ferrara, and Judge Ferrara were both on vacation.

110.    Between August 28, 2013 and September 10, 2013, Defendant BARTOLOMEY willfully
ignored and failed to return the Plaintiff's phone calls.  The Plaintiff left her several voicemails
with the intent to set up a conference call.

111.    The following week, the Plaintiff attempted to call Judge Ferrara and Mr. Schmidt
several more times to see if they returned from their respective vacations.

112.    Time was of the essence and being unable to get a hold of Judge Ferrara and his court
attorney, Mr. Schmidt, as well as Defendant BARTOLOMEY willfully not returning the
Plaintiff's calls, the Plaintiff, between September 2nd  to September 3rd, 2013,  called Defendant
GARDNER.   The Plaintiff politely asked Defendant GARDNER if Judge Edwards  would be
willing to resign a new subpoena since Judge Ferrara and Mr. Schmidt  were on vacation. The

Plaintiff further explained during his call with Defendant GARDNER that Mr. Altman, the 18B lawyer that Judge Edwards forced upon him, composed an erroneous subpoena and has now put his evidence at risk.  Defendant GARDNER willfully hung up the phone.

113.      A court is a tribunal, often a governmental institution, with the authority to adjudicate legal disputes between parties and carry out the **administration of justice** in civil, criminal, and administrative matters in accordance with the rule of law. In both common law and civil law legal systems, courts are the central means for dispute resolution, and it is generally understood that all persons have an ability to bring their claims before a court. Similarly, the rights of those accused of a crime include the right to present a defense before a court. On September 3rd, 2013, the Plaintiff made the prudent decision that he had enough of the courts violating his rights, failing to do their jobs, upholding their oath of office, failing to report professional misconduct and as a result most importantly  jeopardizing his evidence, that the Plaintiff placed a call to Defendant GARDNER once again to inquire about the spelling for the following names:   Judge Edwards, the court officers that were working on May 28,2013 and July 24, 2013,  and Defendant GARDNER,  so that he could file a civil lawsuit.

114.      Sometime after the call with the Plaintiff, Defendant GARDNER, on information and belief, contacted Defendant BARTOLOMEY and informed her that the Plaintiff placed a call to her office.

115.      A bench warrant is issued by a judge when a defendant violates the rules of the court. Most often, the defendant has simply failed to show up. Once a bench warrant is issued, however, the police can treat it like any other arrest warrant -- and use it to bring the defendant back in front of the judge.

116.      On September 9, 2013, Defendant BARTOLOMEY moved the Plaintiff's next court appearance that was scheduled for September 26, 2013, to September 9th, 2013, without providing any notice to the Plaintiff. On information and belief, Defendant BARTOLOMEY in her advocate role, procured a bench warrant for the arrest of the Plaintiff.  Defendant BARTOLOMEY  initiated an ex parte request in Jury Part 1,  in front of the Honorable Neil E.

Ross, stating that Mr. Leibovitz has violated prior instructions given by Judge Ferrara to have no contact with Judge Edwards and Defendant GARDNER and that a bench warrant is so requested. However, Defendant BARTOLOMEY, who was present in front of Judge Ferrara and the Plaintiff on August 9th, 2013, fully knew that Judge Ferrara's on record discussion with the Plaintiff as to how he would have to comport himself if allowed to proceed as a self-represented litigant **did not constitute a lawful order of the court or a legal mandate**. [3]

117.    On or about September 9th, 2013 Defendants BARTOLOMEY and GARDNER, acting jointly, intentionally, maliciously, directly, indirectly and in bad faith were able to convince Judge Ross to sign off on an unlawful bench warrant for the Plaintiff's arrest based on Judge Ferrara's on record discussion ," And you will have no further communications with her (Judge Edwards) or her court attorney (Ms. Alana Gardner) ".

118.    The aforesaid **on record discussion** failed to be <u>**clear and explicit**</u> in its terms. Defendants BARTOLOEMY and GARDNER, both attorneys, were fully aware that Judge Ferrara's on record discussion did not constitute a lawful order of the court and that a person cannot be arrested and be found guilty of criminal or civil contempt of court under sections 750 and 753 of the Judiciary Law, unless he willfully violates **a lawful mandate of the court,** and it is not contempt if the only mandate or direction of the court violated is an **oral one**, for a mandate as defined in section 28-a of the General Construction Law comprehends only a **written direction** or order of the court, a judge or person acting as judicial officer.

119.    Sometime between September 9th and September 23, 2013, the Plaintiff received an initial call from Defendant VALLE.

120.    During the call, Defendant VALLE informed the Plaintiff that there was an outstanding bench warrant for his arrest.

---

[3] Plaintiff reserves the right during and after discovery to amend the amended complaint if discovery shows that Defendant BARTOLOMEY procured the unlawful bench warrant by providing personal sworn affidavits.

121.    Bench warrants are a serious matter and are not to be taken lightly. Knowing this, the Plaintiff, a law abiding citizen, listened very carefully and then inquired by asking Defendant VALLE to elaborate and to provide him with more information with regards to why and how the bench warrant was procured and for her to provide him some identification.

122.    Defendant VALLE did not take a liking to being questioned and said, "Mr. Leibovitz, we heard you are a good guy, come down to our office, appear in court to resolve the matter."

**123.**    Under N.Y. CPL. LAW NY CLS CPL § 530.70,   Order of recognizance or bail; bench warrant,  must be executed in the same manner as a warrant of arrest, as provided in section 120.80. Under NY Code - Section 120.80: Warrant of arrest; when and how; executed on any day of the week and at any hour of the day or night. 2. Unless encountering physical resistance, flight or other factors rendering normal procedure impractical the arresting police officer must inform the defendant that a warrant for his arrest for the offense designated therein has been issued. **Upon request of the defendant, the officer must show him the warrant if he has it in his possession. The officer need not have the warrant in his possession, and, if he has not, he must show it to the defendant upon request as soon after the arrest as possible.**

124.    All the Plaintiff wanted were some answers. He repeated his question once again and asked Defendant VALLE why was there an outstanding bench warrant for his arrest and for her to provide him with the bench warrant, affidavit or supporting evidence that was able to convince the Judge to issue the bench warrant.

125.    Misinformed and unprepared, Defendant VALLE said she didn't know  and advised the Plaintiff to once again come down to her office because she wanted to help him out.

126.    The Plaintiff then followed up and asked Defendant VALLE, expecting her to know at least the answer to the following question, what was the name of the Judge that signed off on the bench warrant.

127.     Once again Defendant VALLE couldn't provide an answer to the Plaintiff.  At this point the Plaintiff was beyond annoyed and stated," I am a bit confused:  if the legal definition of detective is a person, usually a member of a police force, who investigates crimes and obtains evidence or information how come you can't provide me answers to my questions."

128.     The Plaintiff concluded his inquiry by  informing  Defendant VALLE to stop violating his procedural due process, that once she provides him answers only then  will he  consider his options and then hung up on Defendant VALLE.

129.     Sometime after Defendant VALLE's initial call, the Plaintiff called the Manhattan DA Squad to conduct his own investigation.  The Plaintiff spoke to an unidentified male Detective and told him that detectives need to be more informed and should investigate the situation first before calling people about bench warrants.  The Plaintiff provided the male detective all the objective facts from inception of his first arrest, the court proceedings and warned his office that if he is touched and arrested there will be a huge lawsuit. The Plaintiff concluded the call by instructing the male detective to investigate why Judge Edwards was recused and that the "oral directive" Judge FERRARA gave on August 9th, 2013 did not constitute a lawful order of the court or a legal mandate. Just like Defendant VALLE, the male Detective stated just come down here to resolve the matter.

130.     Later that afternoon,   Defendant VALLE finally called the Plaintiff and informed him that Judge Ross signed off on the "alleged bench warrant".

131.     The Plaintiff then followed up and asked Defendant VALLE to provide him the supporting evidence that was given to Judge Ross" and once again a copy of the warrant.

132.      Defendant VALLE failed to provide the Plaintiff with his aforesaid requests.

133.     Later on that day, the Plaintiff called Defendant VALLE.

134.    The Plaintiff was adamant about getting updates and more information with regards to
what was going on with the bench warrant.  Defendant VALLE warned the plaintiff to stop
harassing her for which he replied:

> "You call me with a bench warrant, having no clue what it's
> about and then I call you multiple times asking you to provide
> me information, for you to do your job and now I am harassing
> you?  Does that make any sense? I am calling you on your work
> phone!!!! "

135.    The Plaintiff was so frustrated with the legal system that he proceeded to curse
Defendant VALLE out as politely as he could. The Plaintiff then warned her that if she doesn't
do her job and investigate the bench warrant once this was over he was going to see her in
Federal Court.  The Plaintiff concluded the call by warning Defendant VALLE one more time
that she should investigate why Judge Edwards was recused, that Judge Edwards violated the
Plaintiff's constitutional rights and that Defendant GARDNER failed to do her job.  The
Plaintiff left off with his last clue by reminding Defendant VALLE that Judge Ferrara's on
record discussion with him as to how he would have to comport himself if allowed to proceed as
a self-represented litigant **did not constitute a lawful order of the court or a legal mandate**

136.    On September 13, 2013, the Plaintiff once again called Defendant GARDNER at her
office, this time inquiring if she was responsible for the bench warrant being issued.

137.    On September 16, 2013 at 11 a.m., the Plaintiff called Mr. Schmidt to discuss his
following concerns:

    A.  The outstanding bench warrant for his arrest

    B.  New subpoena

    C.  Judge Ferrara's incomplete Unlawful Oral Directive

    D.  The Plaintiff's  August 7th, 2013 phone calls

    E.  Judge FERRARA's  vacation

    F.  Judge EWARDS's failure to uphold the Constitution

138.     Mr. Schmidt assured the Plaintiff that he was here to help and that he was going to resolve the problem.

139.     As a result of the Plaintiff's refusal to turn himself in due to the fact that Defendant VALLE failed to identify herself, provide evidence of the bench warrant and to explain why and how the bench warrant was procured, in the early morning of September 17, 2013, Defendant VALLE went to the Plaintiff's brothers house, and informed his brother that she was looking for the Plaintiff, that she had a bench warrant for his arrest and left her contact information.

140.     At 9:40 a.m., the Plaintiff's brother emailed him a blurry image of the bench warrant and a clear image of Defendant VALLE's contact information.

141.     Sometime after Defendant VALLE's visit to the Plaintiff's brothers' house, the Plaintiff called Defendant VALLE and asked her if she investigated the "alleged bench warrant" and if he could get a copy of the bench warrant. Defendant VALLE willfully hung up.

142.     Sometime after September 9th, 2013 but before September 21, 2013, on information and belief Defendant VALLE sought the advice of Defendant BARTOLOMEY. Defendant BARTOLOMEY advised Defendant VALLE that she had probable cause to arrest the Plaintiff. Defendant BARTOLOMEY, in her non-advocate role, performed the **function** of giving legal advice to Defendant VALLE, in the investigative phase of the Plaintiff's criminal case. Defendant BARTOLOMEY communicated with Defendant VALLE and advised Defendant VALLE how to procure a misdemeanor arrest warrant for the Plaintiff and to charge the Plaintiff with the following:

   (1) Aggravated Harassment in the 2nd Degree;
   (2) Criminal Contempt in the 2nd Degree.

143.     On September 20, 2013, Defendant VALLE, shield 03637, signed off on an accusatory instrument. In the accusatory instrument, Defendant VALLE knowingly provided false statements by stating she reviewed a copy of the August 9th, 2013 transcript, docket 2013

NY026141, which indicated that the Plaintiff was present for the proceedings, that the defendant was ordered to cease all calls to the Hon. J. Erika Edwards and to her court attorney, and that the defendant indicated he understood the Hon. Judge Ferrara's order. Defendant VALLE was fully aware, after the Plaintiff explained to her multiple times over the phone from September 9th to September 17th, 2013, that Judge Ferrara's on record discussion did not constitute a lawful order of the court. On September 9th, 2013 the Plaintiff requested that Defendant VALLE investigate the situation. Defendant VALLE in retaliation (Plaintiff's threat of a Federal Lawsuit against Defendant VALLE and for her to do her job averment 127) procured an unlawful arrest warrant for the Plaintiff.

144.    On or about September 20, 2013, Defendant VALLE was able to convince the Hon. Judge Peterson to sign a misdemeanor arrest warrant for the Plaintiff's arrest as the result of her falsified accusatory instrument.

145.    In the early morning of September 23, 2013, on information and belief, Defendants Richard Roes 1-4 left Manhattan and entered Queens to execute the unlawful "bench warrant"/ "arrest warrant" for the Plaintiff's arrest.

146.    On September 23, 2013, at approximately 6:15 a.m., Defendant Richard Roe #1 broke into the Plaintiff's 2nd floor apartment residence, by entering through the living room window.

147.    Upon entry, Defendant Richard Roe #1 allowed Defendants Richard Roes #2-4 to enter through the main entrance door of the apartment residence.

148.    The Plaintiff notified Defendants Richard Roes #1-4 that he patiently waited for them to arrive and then warned them that they were now participating in violating his Constitutional rights by executing an unlawful bench warrant and that Detective VALLE was given full notice, warned and advised to investigate Judge Ferrara's on record discussion which did not constitute a lawful order of the court.

149.    At approximately 6:30 am, Defendant Richard Roe #1 arrested the Plaintiff by placing handcuffs on both his hands. The Plaintiff was then escorted out of the apartment residence, taken down stairs, placed in the back seat of "black mini-van" and transported back to Manhattan, on information and belief, upper eastside Detective Office (located at approximately mid 90's street and 2nd avenue) and temporarily placed in a holding cell.  A few minutes later the Plaintiff was transported to Manhattan Central Booking.

150.    On September 23, 2013, at approximately 6:30 in the morning the Plaintiff became a victim of an unlawful arrest and was deprived of his liberty and the right to feel secure in his own home.  The Plaintiff was arrested with an unlawful bench warrant/arrest warrant, without probable cause and his Constitutional Rights- Fourth, and Fourteenth Amendment were violated.

151.    On September 23, 2013, on information and belief, at approximately 8:00 pm, Defendant VALLE unlawfully arrested the Plaintiff for calling Defendant GARDNER on September 3rd and 11th, 2013.  On September 23, 2013, the Manhattan County District Attorney's Office filed a misdemeanor complaint No. 072941/ 13  charging the Plaintiff with one count of each of:

    (1) Aggravated Harassment in the 2nd Degree;
    (2) Criminal Contempt in the 2nd Degree.

152. The Plaintiff remained unlawfully incarcerated from September 23, 2013 until October 4th, 2013.

153. The Plaintiff was arraigned on Manhattan County Misdemeanor Complaint No. 072941/13 on September 23, 2013.  He pled not guilty.

154.    On September 23, 2013, while waiting patiently in the Manhattan Detention Center bullpen, to see Judge Stratsinger,  a female lawyer from Legal Aid  requested that the Plaintiff come speak to her in the bullpen cubicle. The female attorney informed the Plaintiff that Legal Aid was representing him. The following conversation ensued:

    Plaintiff:       "Young lady,  I will be conducting my own defense and that I

don't need your assistance. If I needed an attorney I would have

hired a private attorney".

Legal Aid Female Attorney:  "Then you will not see the judge tonight".

Plaintiff:       "Excuse me did I hear your correctly?  If I don't take a lawyer I

won't see the Judge tonight?, Did you really say that?  Are you interfering and violating

my due process as well?  I understand substantive law and procedural law and

understand the procedures here.  If you don't allow me to see the judge tonight based on

the fact that I didn't take your representation make sure you remember this ugly face

because I will see you in court!!"

155.     As a result of the Plaintiff's response, the female lawyer stepped out and informed Legal

Aid.  A few minutes later, a male supervisor for Legal Aid, entered the bullpen cubicle and stated

the same thing his co-worker stated to the Plaintiff.  The Plaintiff warned the male supervisor

that he has five minutes to get him  out in front of the Judge or he will sue him in Federal Court.

156.     Several minutes later, the Plaintiff was in front of Judge Stratsinger.

157.     Late that evening, in AR3,   the Plaintiff appeared for arraignment in front of Judge

Stratsinger.  Defendant BARTOLOMEY argued that bail should be set for $10,000 for the

following reasons:

    A. From day one the Plaintiff has been disrespectful to the courts.

    B.  The Plaintiff refused  to turn himself in for the bench warrant that was issued by

       Judge Ross.

158.     Judge Stratsinger  took Defendant BARTOLOMEY's arguments under consideration and

then the Plaintiff  argued his position.  The Plaintiff argued the following points:

    A. Defendant BARTOLOMEY has a tendency of  telling stories from chapter three and

       leaving all the relevant points out in order to get a decision rendered in her favor.

    B. He was respectful of the courts from day one up until Judge Edwards violated his

       constitutional rights. From that point on he has been standing up for his rights.

C.  Judge Edwards failed to uphold her Oath of Office and violated the Plaintiff's due process by twice subjectively denying his pro se application.

D.  The Plaintiff refused to turn himself in because Defendant VALLE failed to provide him information with regards to the bench warrant. Furthermore Judge Ferrara's oral directive did not constitute a lawful order of the court or a legal mandate.

E.  The Plaintiff's behavior on August 7th, 2013, was protected speech and thus could not be penalized nor forbidden. The courts staff's failure to report Judge Edwards judicial misconduct, has directly led to this false arrest.

F.  If the judge sets bail for $1, the Plaintiff will still not post bail out of principle.

159.    Judge Stratsinger rendered a subjective ruling resulting in the Plaintiff being unlawfully remanded.

160.    At the September 24, 2013 hearing, the following transpired:

The Plaintiff was re-arraigned by Judge FERRARA for the following reason:

September 24, 2013 Minutes    Page 3  Lines 11-

**Judge Ferrara:** I see that when he (Mr Leibovitz) appeared in arraignments, in AR3, the judge remanded him. That's not a proper resolution of the case. The CPL does not allow for remand on a misdemeanor, unless it was a violation of a conditional charge. So I'm going to hear both sides on bail. People, I'll hear you on bail, and then I'll hear Mr. Leibovitz".

**Defendant BARTOLOMEY:** Thank you, Your Honor . Your Honor, as you are aware, the People requested this bench warrant be issued, as it is our position that the defendant while released on his own recognizance violated the conditions of his release, pursuant to CPL 530.60 sub one , by his continue disregard of your lawful order given here, or given up in Part One, on August 8th , 2013 of this year—on

August 9th, I believe of this year, I have a copy of those minutes, if your Honor would like them.

**Judge Ferrara:** They're in the file and I see that they were supplied in docket ending 2941, which is the most recent arrest, and I read them a minute ago. I refreshed myself on what happened.

**Defendant BARTOLOMEY:** So it was that conduct that fueled the People's request for the bench warrant in this case. It's our position that he has now revoked his own status of recognizance. The conduct described previously is now the basis of a new arrest and a new case. And I think that a new arrest, although it was made after the bench warrant was ordered, I think that now it's relevant at this stage and our application is that now I think bail should be set on this case in the amount of $10,000 cash or a reasonable bond alternative, as this defendant has shown continuously that he has absolutely no respect for the Court's lawful orders. Your Honor ordered him to stop calling Judge Edward's chambers. He did not. He continued to call Ms Gardner and yell and scream at her. And then when he is offered the opportunity to turn himself in peacefully on the bench warrant, he began calling Detective Valle cursing her out and then finally threatening her. He's been given every opportunity to turn himself in peacefully, which he has refused to do. I think that now bail is appropriate in this case, and we so we are asking for bail in the amount of $10,000 cash.

**Judge Ferrara:** Okay Thank you I'll hear Mr. . Leibovitz

**Plaintiff:** I just want to say that for every action there's always a reaction. And from inception when I was in front of Judge Edwards the courts violated my rights. And you know what ? I have to fight for my rights. I've gone to the law library. I've looked at case law. I respected the courts in the sense of trying to attain my constitutional rights. Now, when I was in front of you—I'm sorry. Before I was in front of you, Judge Edwards issued a subpoena and signed off. The subpoena was not done properly. I reached out to the building and her name is Kim Ward—and told me

the subpoena is not legitimate. I respect it, but it's not done properly. So I reached out to you, your chambers. But you were on vacation. Now according to page 10, it states —

**Judge Ferrara:** Page 10 of what?

**Plaintiff:** The minutes from August 9th. You stated to me that Mr Altman issues the subpoenas on your behalf. I requested it and it wasn't done. I was put in a catch 22, where I needed a subpoena signed. So I left a message. I was trying to reach out. I even reached out to her multiple times.

**Judge Ferrara:** To Whom?

**Plaintiff:** The ADA

**Judge Ferrara:** Yes

**Plaintiff:** She doesn't get back to me. Once again my due process is violated. How am I supposed to feel? I am fighting for my rights here. You guys have your false accusations, which I cant wait to defend. My constitutional rights are disrespected. I have witnesses on the first day when I was in front of Judge Edwards, where she tells me." I'm like " Your Honor, are you familiar with Faretta Versus California? I have a right."

161.     The Plaintiff continued to argue his position that Judge Ferrara's August 9th, 2013 "oral directive" did not constitute a lawful order of the court or a legal mandate.

162.     The Plaintiff further argued that Defendant BARTOLOMEY kept slandering him by stating he was disrespectful of the courts when in actuality it was just the opposite. From day one the Plaintiff was respectful of the courts by arriving early for scheduled court hearings and courteous during the hearings. On May 28th, 2013, the day Judge Edwards subjectively denied the Plaintiff's first pro se application and broke the law, only then did the Plaintiff start standing up for his rights.

163.     Defendant BARTOLOMEY failed to understand that the Plaintiff was only standing up
for his rights and that the truth was the courts were disrespecting him.   Her failure was due to
twofold, one if this case were to go to trial it was going to be  her first and second due to  the fact
that Defendant VANCE has a conviction rate policy which as a result  incentivizes prosecutors to
procure as many convictions as possible, and that courts and bar organizations are notoriously
lax at sanctioning misconduct.

164.     On or about September 24, 2013, Judge Ferrara granted the People's application and set
bail at $10,000, insurance company bail bond, or $10,000 cash.

165.     Judge Ferrara then discussed the new subpoena:

> **Judge Ferrara:**   Mr Altman the subpoena that was issued to Le Triomphe was
> issued erroneously.  There were defects.  I sent a letter, copied to you
> explaining what needs to be done to correct it.  You may present a subpoena to
> me at any time, in corrected version and I will sign it so you that can serve it
> on the building and get the necessary videotape.
> **Mr Altman:**  I will do that, you Honor.  I have already prepared a new
> subpoena.

166.     Judge Ferrara concluded the hearing by warning the Plaintiff not to call Judge Edwards
and Defendant GARDNER, while he was in jail.  Judge FERRARA was going to give the
Plaintiff an opportunity over the next two weeks to behave and if he did at his next hearing Judge
Ferrara would consider his bail application. Court was adjourned for September 27, 2013.

167.     At the September 24, 2013 hearing, if one analyzes the aforesaid colloquy that took
place, the following transpired:

   A. Defendant BARTOLOMEY, knowing she has prosecutorial immunity, once again
      was able to lie in court and state the following without any civil liability because
      she was in her advocate role:

"defendant while released on his own recognizance violated the conditions of his release, pursuant to CPL 530.60 sub one   So it was that conduct that fueled the People's request for the bench warrant in this case.  It's our position that he has now revoked his own status of recognizance.  The conduct described previously is now the basis of a new arrest and a new case.  And I think that a new arrest, although it was made after the bench warrant was ordered."

B. At the Plaintiff's April 4th, 2013 bail hearing, the Plaintiff was released on his own recognizance with no condition with regards to Judge Edwards and Defendant GARDNER.  Once again Defendant BARTOLOMEY was grasping at straws in order to maliciously prosecute the Plaintiff, get a decision rendered for the People and help improve New York County's conviction rate.

168.    On September 24, 2013, Defendant GARDNER filed a criminal complaint against the Plaintiff and he was charged with aggravated harassment and criminal contempt under New York law. Defendant GARDNER's decision to file a criminal complaint on September 24, 2013, was in no sense judicial or adjudicative.  Here, the criminal allegations contained in the complaint belonged to Defendant GARDNER, the complaining witness, and to Defendant GARDNER alone.  Defendant GARDNER was the person who set the judicial process in motion, when she initiated her prosecutorial acts and swore to the affidavit supporting the criminal complaint and filed the complaint and affidavit.

169.    At the September 27, 2013 hearing the following transpired:
    A. Defendant BARTOLOMEY served Defendant GARDNER's supporting deposition with the Plaintiff.
    B. Defendant GARDNER intentionally, maliciously and in bad faith failed to mention and include in the deposition, for obvious reasons, the Plaintiff's initial September phone call, the call requesting Judge Edwards to resign a new subpoena.
    C. Judge Ferrara dismissed another charge, harassment in the 2nd degree, with  regards to the Plaintiff's April 3rd, 2013 arrest.

D. Judge Ferrara then asked Defendant BARTOLOMEY if she received any indication from Judge Edwards or Defendant GARDNER if there was any communication whatsoever with the Plaintiff. Defendant BARTOLOMEY stated no.

E. The Plaintiff argued his position against the September 23, 2013 bench warrant arrest.

F. The Plaintiff read the following case, People v Pierre-Lewis *34 Misc. 3d 703*; *927 N.Y.S.2d 592*; *2011 N.Y. Misc. LEXIS 3642*; *2011 NY Slip Op 21254,* on the record to support his position. The aforesaid case is analogous to what has recently transpired with the Plaintiff. The Appellate court in People v Pierre-Lewis reversed the trial court's decision and dismissed the case finding the statute of Penal 240.30 unconstitutional.

G. Judge Ferrara then stated that a motion to dismiss on constitutional grounds must be made in writing and notice must be given to the Attorney General of the State of New York so they can weigh in on it.

H. Judge Ferrara concluded the hearing by stating that at the next hearing, scheduled for October 4th, 2013, he would entertain the Plaintiff's bail application.

170.     At the October 4, 2013 hearing the following transpired:

A. The Plaintiff finally received his most important evidence, the April 3, 2013 Building arrest video .

B. Judge Ferrara inquired once again if there was any contact between the Plaintiff and Defendant GARDNER as well as Judge Edwards. Defendant BARTOLOMEY stated none that she is aware of.

C. Judge Ferrara then asked the Plaintiff if he wanted to make a bail application. The following colloquy ensued:

**Plaintiff:**        You said you would reduce it to zero is that correct?

**Judge Ferrara:** I said I would entertain a bail application from you, but I will have to hear you on it, or do you prefer staying in custody during of the course of the trial?

**Plaintiff:**    I am making a bail application. I haven't contacted the judge, or her lawyer and I don't plan to.

**Judge Ferrara:** Okay. The current bail on your case is 10,000 bond or cash on each case. I am looking favorably. I will reduce the cash alternative on the second case, and allow you to pay it in cash or credit card. Under the procedures of the court I can reduce it down to $2500. Can you afford to do that?

**Plaintiff:**    Can I ask the reason 2500 not zero? You told me if I don't speak to the lawyer you will reduce it down to zero.

**Defendant BARTOLOMEY:** Your Honor may I be heard before your Honor makes a decision?

**Judge Ferrara:** Yes First talking to the DA and then I will respond to you. Go ahead.

**Defendant BARTOLOMEY:** Your Honor, the People ask that bail conditions remain the same at this time. Although it's true Mr Leibovitz has not contacted Ms. Gardner, that's only because he was in custody. I am sure he does not have her name listed----

**Plaintiff:**    (646) 386 -4678

**Defendant BARTOLOMEY:** I stand corrected if that's her number.

**Judge Ferrara:** Obviously he knows the number.

D.   Bail was reduced.

E.   The Plaintiff refused to post bail out of principle.

F.   Mr. Altman posted bail on behalf of the Plaintiff

G.   The Plaintiff was released from jail.


171.    Once again Defendant BARTOLOMEY, in her advocate role, subjectively argued THE PEOPLE's position based on frivolous assertions. Defendant BARTOLOMEY as she has done throughout the whole criminal proceeding, has maliciously and in bad faith looked for any angle to have the Plaintiff punished. As the aforesaid colloquy shows, the Plaintiff had Defendant

GARDNER's phone number committed to memory, however if he really wanted to call and needed to get the number, he could have easily used another inmate's phone line to call a friend.

172.    The weekend before trial, in the early morning of October 5th and October 6th, 2013 , the Plaintiff worked with Mr. Altman in preparation for trial that was scheduled for October 7th, 2013. The Plaintiff worked on the following:

    A. Meticulously broke down video frames and notated key times from the building arrest video;

    B. Prepared his case in chief, direct and cross examination questions, voir dire questions, opening statement, and outlined his closing argument;

    C. Reviewed all his legal notes that he had currently assembled;

    D. Watched YOUTUBE videos of court proceedings.

173.    In the early morning of October 7th , 2013, after spending all weekend preparing for his trial, Plaintiff realized that he wasn't completely prepared to properly defend himself. The false arrest, confinement, malicious prosecution and 12 days in custody took a toll on him physically and mentally.

174.    On August 9th, 2013 during the Plaintiff's third pro se application hearing, Judge Ferrara stated, "I'm going to give you enough time to prepare the case."

175.    Needing more time to prepare his defense, on October 7, 2013 at 2:30 am, the Plaintiff prepared his  first Motion for Continuance.  Although, Judge Ferrara stated he would grant the Plaintiff enough time to prepare his case, the last few rulings made by the courts alerted the Plaintiff to hedge his motion.  As a result the Plaintiff prepared a written Motion to Recuse Judge Ferrara.

176.    At the October 7, 2013 hearing the following transpired:

    A. Judge Ferrara signed the Plaintiff's subpoena duces tecum to command the building owners of  Le Triomphe to produce by November 2013 the  original March 16th, 2013

videos and recording from the lobby and the front of the building of Le Triomphe located at 245 58th Street, New York, NY 10022 .

B. The Plaintiff filed his first Motion for Continuance which resulted in Judge Ferrara subjectively denying the motion.

C. The Plaintiff filed a Motion to Recuse Judge Ferrara which resulted in Judge Ferrara subjectively denying the motion.

D. As a result of the two denied motions, the Plaintiff was forced to relinquish his pro se rights.

E. Mr. Altman took over as lead counsel and requested a month continuance for which Judge Ferrara granted.

F. The Plaintiff just smiled at Judge Ferrara.

177.    Upon the conclusion of the October 7th, 2013 hearing , Mr. Altman served Defendant BARTOLOMEY with Plaintiff's exculpatory evidence which included:

A. A copy of the  April 3rd, 2013 ,  video recording from the Le Triomphe building where the arrest occurred

B. A copy of Plaintiff's cell phone video recording of the police officers, Devita and Nason, prior to the arrest and during the arrest

C. A copy of Plaintiff's cell phone video recording of the conversation with the doorman from the Le Triomphe  building acknowledging

i.  Plaintiff Leibovitz called 911 first

ii.  March 16th, 2013 process service mishap by the building

iii.  Doorman's apology to Plaintiff Leibovitz.

178.    After being in possession for  about a month with the Plaintiff's exculpatory evidence, on November 7th, 2013, Defendant BARTOLOMEY was still willing to prosecute the Plaintiff's case.

179.    In November, 2013, the Plaintiff, was notified by Amy Ward that unfortunately the March 16, 2013 video surveillance that he subpoenaed no longer existed. Amy Ward further notified the Plaintiff that the **building surveillance videos last for approximately a month.**

Luckily, the Plaintiff was able to get his April 3rd, 2013 surveillance videos from Ms. Ward back on October 4, 2013.

180.     In mid-November of 2013, one of Defendant BARTOLOMEY's dreams were about to come to fruition, prosecuting her first trial:

            The People vs Etan Leibovitz docket# 2013NY026141

181.     Back in September of 2012, Defendant VANCE "hired" Defendant BARTOLOMEY, after she completed her internship at the Queens District Attorney's Office.   Since her hiring, Defendant BARTOLOMEY has been further nurtured and trained by the New York County District Attorney's Office to abide by an unconstitutional policy, custom and practice: conviction rate, that promotes a high conviction rate as opposed to a constitutional policy, custom and practice justice rate, that promotes a high justice rate.

182.     A Conviction Rate Policy, custom and practice even in its purest form is unconstitutional. Allowing a conviction rate policy, custom and practice to coexist with prosecutorial immunity, is inherently ingredients for disaster, which will unfortunately lead to prosecutorial misconduct, injustice and false convictions. If a conviction rate is a tool that is used to determine how effective the DA's Office is conducting business it will unfortunately lead prosecutors to sacrifice justice for convictions.

183.     Such is the case when Defendant BARTOLOMEY, in her advocate role, prosecuted her first trial against the Plaintiff. During trial, Defendant BARTOLOMEY, knowing she has prosecutorial immunity, slandered the Plaintiff in front of the jury, manipulated the evidence even though two objective videos showed otherwise, knowingly allowed the People's witness to commit perjury (arresting officer Nason, his partner Devita, the complaining witness Charles Poliacof and his lawyer Mr. Reyhani). [4]

184.     The Plaintiff, who had no criminal record whatsoever, on November 19, 2013 was convicted and found guilty of aggravated harassment in the second degree (1) and (2).   The

---

[4] Plaintiff is in the process of filing an Appeal to reverse the conviction.

judgment of conviction was scheduled to be entered against the Plaintiff and sentence imposed on December 16, 2013.

185.    Following his conviction, as he had done both before and during his trial, the Plaintiff waged a tireless campaign to prove his innocence due to his first arrest and second arrest from behind bars.  Between November 20, 2013 to December 10, 2013 while at Manhattan Detention Center and then later at Brooklyn Detention Complex (from December 3, 2013 to December 31, 2013), the Plaintiff's efforts were dedicated to studying, reviewing and preparing for post-conviction relief pursuant to CPL 330.30 and  CPL 440.10 motions.

186.    Under CPL 330.30 at any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the following grounds: 1. Any ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court. 2. That during the trial there occurred, out of the presence of the court, improper conduct by a juror, or improper conduct by another person in relation to a juror, which may have affected a substantial right of the defendant and which was not known to the defendant prior to the rendition of the verdict; or 3. That new evidence has been discovered since the trial which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant.

187.    On December 9, 2013 Mr. Altman filed and served by Notice of Motion, an Omnibus motion, to dismiss the September 23, 2013 misdemeanor complaint.

188.    On December 10, 2013, the Plaintiff prepared a typed letter directing it to Judge Ferrara. His letter begins, " I was recently convicted in your Court of Aggravated Harassment, an "A" Misdemeanor, after a jury trial.  I believe the jury's finding was erroneous, based upon both false and misleading evidence.  I wish to prepare and submit a CPL 330.30 Motion to set aside the verdict. This Motion is to be reviewed and considered by the Court prior to sentencing.  My

sentencing is currently scheduled for December 16th, 2013.  In order to file the CPL 330.30 Motion which will be prepared pro se I will need to first obtain all of the minutes of the trial including the opening statements and jury charge"   the Plaintiff continued, "I am therefore herewith requesting that my sentencing be postponed for a period of 60 days, until February 14, 2014."

189.     A few days prior to commencing the letter, the Plaintiff called Mr. Altman multiple times from the Brooklyn Detention Complex,  and informed Mr. Altman that he was going to file a 330.30 motion.   First he was going to type a letter requesting that sentencing be adjourn and if Mr. Altman could file his letter as soon as possible with the Manhattan Criminal Courts and with the Manhattan DA's office.  Mr. Altman stated that it wouldn't be necessary because he would provide the letter to the courts on December 16, 2013, the next court appearance.

190.     The Plaintiff's sentencing date was adjourned twice from the 16th to the 17th and then finally for the 30th of December, 2013, due to the Courts conducting another trial.

191.     Allocution is the direct address between the judge and the convicted defendant prior to sentencing.  During the address, the judge speaks directly to the defendant and asks if the defendant has anything to add prior to hearing the sentence.  The defendant then answers the judge and may say anything in an effort to lessen the severity of the sentence, such as an apology, an offering of remorse, or an explanation of the motivations that drove the defendant's criminal actions.

192.     On December 30, 2013 ,  Department of Corrections , herein "DOC",  produced the Plaintiff  to Manhattan Criminal Court from Brooklyn Detention Center  and the Plaintiff waited patiently in the DOC  bullpen to be seen by Judge Ferrara.

193.     In the late morning on December 30, 2013, a Court Officer came downstairs to escort the Plaintiff up to the courtroom, Part E, in front of Judge Ferrara.

194.    Prior to escorting the Plaintiff upstairs to the courtroom, a court officer asked the Plaintiff to place his hands behind his back and handcuffs were placed.  While the handcuffs were being placed, the Plaintiff readjusted his legal paperwork from his left hand to his right hand.

195.    Prior to entering the courtroom, the Court Officer placed the Plaintiff, in the courts holding cell, which is adjacent to the courtroom, so that Mr. Leibovitz had an opportunity to speak to Mr. Altman prior to the commencement of the sentencing hearing.

196.    Defendant Jane Doe was stationed by the holding cell.

197.    Mr. Altman was summoned from the courtroom to the holding cell and a conversation ensued. The Plaintiff reiterated and instructed Mr. Altman to request Judge Ferrara  to  adjourn sentencing  so the Plaintiff could file his 330.30 Motion.

198.    The Plaintiff handed Mr. Altman the December 2013 letter he prepared for the courts. Mr. Altman informed the Plaintiff that it looks like Judge Ferrara will not grant this request.

199.    The Plaintiff looked at Mr. Altman puzzled and stated , "How is that even possible, it is my right to file a 330.30 motion. If Judge Ferrara denies my request to adjourn sentencing today, filing the 330.30 motion then  will become moot.  I need to file this motion after conviction and prior to sentencing. "

200.    A few minutes after Mr. Altman and the Plaintiff concluded their discussion about the Plaintiff's legal matters, the court officer escorted the Plaintiff into the courtroom and positioned him by the defendant's table, to the right of Mr. Altman, and left the handcuffs on.

201.    When the hearing commenced, Mr. Altman  spoke on the Plaintiff's behalf stating that the Plaintiff  needed to adjourn the sentencing hearing that was scheduled for today so that  he could prepare and  file a CPL 330.30 motion. In preparation to file the motion the Plaintiff would need all the minutes from all his court appearances

202.     Upon hearing the Plaintiff's request, Judge Ferrara stated that the Plaintiff had more than enough time to put in a request for the minutes and to prepare his post-conviction relief motion while he was incarcerated. As a result, Judger Ferrara once again subjectively denied the request.

203.     Upon hearing the reasoning for the denial, the Plaintiff argued that while he was incarcerated he was studying post-conviction relief motions by going to the Law Library at every opportunity he could and that he prepared a letter for the courts back in early December requesting the courts to adjourn the sentencing hearing.

204.     The Plaintiff further explained to Judge Ferrara that Mr. Altman said he would submit his letter at the next court hearing.   The Plaintiff concluded his argument by stating that if he gets sentenced today his post-conviction motion will be moot because these types of motions can only be filed after conviction and prior to sentencing.

205.     Judge Ferrara upon hearing the Plaintiff's reasoning and argument was not moved and was subjectively adamant about denying the Plaintiff's request.

206.     After witnessing Kangaroo Court in action during pretrial, trial and now during the post-conviction hearing, the Plaintiff had enough of the abuse of power by Judge Ferrara and said in open court ," How many more subjective decisions are we going to make here? ".

207.     Judge Ferrara didn't take a liking and ushered the court officers to silence the Plaintiff.

208.     Once again the NYS Commission for Judicial Conduct failed the people of New York. All the trial judges that the Plaintiff was in front of , their actions and decisions rendered showed they had absolute no fear of losing their jobs.

209.     Defendants DALEY and SAL Doe  surrounded the Plaintiff while he was handcuffed with his hands behind his back and told him to be quiet, and tried to intimidate him but to no avail.

210.     The Plaintiff told the aforementioned Defendants DALEY and SAL Doe, that he had a
right to speak freely during allocution and that Judge Ferrara was embarrassed because there
were approximately 30 people in the public seating area and he didn't want to hear the truth.

211.     Defendants DALEY and SAL Doe, both failed to uphold the integrity of the courts and
failed to understand, as a result of not being properly trained by the State, that the Plaintiff, as
the defendant, was entitled to allocution. Allocution is the right of the defendant to directly
address the judge without the help of counsel.

212.     Defendant SAL Doe then committed assault and battery against the Plaintiff when he
violently grabbed the Plaintiff's handcuffs and dragged him approximately 25 feet out through
the exit doors, into the vestibule, just outside the courtroom holding cell.

213.     Once the Plaintiff was out of site from the general public and the courtroom, Defendant
SAL Doe, then used his left hand and positioned the Plaintiff down and then used his right hand
and pulled the Plaintiff's right ear to impose more pain.

214.     The pulling of the ear lasted approximately 20 seconds.

215.     While pulling the Plaintiff's ear, Defendant SAL Doe stated, "Are you going to behave in
the courtroom because I will show you who is boss?", or words to that effect.

216.     Defendant Jane Doe, who was stationed by the holding cell and Defendant DALEY, both
observed the assault, battery and the use of excessive force yet did nothing to stop and prevent
Defendant SAL Doe.

217.     Sometime during the 20 seconds that the Plaintiff's right ear was being pulled, the
Plaintiff yelled as loud as he could at Defendant SAL Doe, "What the fuck are you doing!!
There are witnesses (implying Defendants DALEY and Jane Doe) , I will sue your ass in Federal
Court. This corrupt institution needs to be investigated. "

218.    In retaliation, Defendant SAL Doe then grabbed the Plaintiff's handcuffs and dragged him downstairs, forcing the Plaintiff to walk down the stairs sideways and sometimes "slightly backwards" as opposed to facing forward, to the DOC bullpen, with Defendant DALEY trailing behind.

219.    Defendant SAL Doe, by forcing the Plaintiff to walk downstairs sideways and sometimes "slightly backwards", put the Plaintiff in danger. Luckily for the Plaintiff it was one flight of stairs and that he was able to balance himself in several situations.

220.    As the Plaintiff was "walking" downstairs awkwardly, not once did Defendant DALEY, who had firsthand view, attempt to stop Defendant SAL Doe.

221.    The Plaintiff was then placed inside the DOC bullpen by himself and proceeded to take his shirt off to see if any other marks or injuries were sustained as the result of the assault and battery and excessive force committed by Defendant SAL Doe.

222.    While inside the bullpen, the Plaintiff screamed in agony due to the sharp, excruciating pain and discomfort.

223.    As a result of Defendant SAL Doe's assault, battery and excessive force, the Plaintiff's left wrist was swollen.   The Plaintiff had no sensation by his thumb area and his right ear was throbbing and warm.

224.    As a result of the Plaintiff yelling in agony while in the DOC bullpen, Correction Officer Moretela came by to check and see if the Plaintiff was ok. The Plaintiff started explaining to Correction Officer Moretela some of the history behind the criminal court proceedings and what just transpired in the courtroom, by the court's holding cell and the stairway. Court Officer Moretela had no patience to hear the Plaintiff's version of the story so the Plaintiff terminated his discussion with Mr. Moretela.

225.     Unable to feel his left hand, the Plaintiff then pleaded with Correction Officer Pratts if he could go to the DOC medical facility to get his hand checked out.

226.     Defendant SAL Doe then came back down just as the Plaintiff was pleading with the other Correction Officers if he can go to the DOC medical facility.

227.     Defendant SAL Doe then asked the Plaintiff, in the presence of Correction Officer Pratts and Correction Officer Moretela, if the Plaintiff wanted to go back upstairs to see the Judge, to complete sentencing and if he was going to behave.

228.     The Plaintiff responded to Defendant SAL Doe that he wants to see the Judge but right now he can't feel his hand. .

229.     Defendant SAL Doe said "I will tell the Judge you don't want to see him".

230.     The Plaintiff responded to Defendant SAL Doe and said,

"Don't put words in my mouth, I said I have a medical concern here, I don't feel my thumb because of you dragging me with the use of the handcuffs."

231.     Defendant SAL Doe , continued to taunt the Plaintiff and said,
          " Ok, I am going to tell the Judge you don't want to see him.    Too bad!
          (Emphasis required)".

232.     The Plaintiff approached the metal bars of the holding cell and looked directly at Defendant SAL Doe and responded by stating,

"Don't fucking put words in my mouth.  Remember my face because I am going to sue your fucking ass for violating my due process and assaulting me. We have witnesses here- Correction Officer Pratt and Correction Officer Moretela. I already memorized their names.   You fucked with the wrong defendant.  Both Department of Correction and the Courts are corrupt

institutions. I will expose these two institutions when I get out.   This is a
fucking joke. "

233.     Defendant SAL Doe then stepped away and on information and belief went back upstairs
to the courtroom.

234.     Upon information and belief, Defendant SAL Doe  did not seek to obtain medical
attention for the Plaintiff.

235.     A few minutes later, Correction Officer Matero walked over to the bullpen where the
Plaintiff was situated.

236.     Overhearing the Plaintiff's discussion with Defendant SAL Doe, Correction Officer
Matero sympathized with the Plaintiff and said to the Plaintiff
           "Go upstairs, see the Judge, state on the record your injury, then
            go for medical treatment for your injury. "

237.     Approximately ten minutes later, Defendants SAL Doe and DALEY came back down
and asked the Plaintiff if he was ready to go upstairs. The Plaintiff obliged.

238.     Defendant DALEY, upon the Plaintiff's request, gently placed the handcuffs back on the
Plaintiff, providing enough room to prevent further injury.  The Plaintiff was allowed to walk
upstairs freely without any excessive force applied by Defendant SAL Doe or any other officer.

239.     When court was back in session, the Plaintiff immediately stated on the record that he
was injured as a result of Defendant SAL Doe and that he would like to seek medical treatment
first before commencement of the hearing.

240.     Judge Ferrara, as he has done throughout the whole court proceedings subjectively
denied the Plaintiff's request.

241.     A few minutes later, the discussion with regards to post conviction relief, CPL 330.30, ensued. The Plaintiff asked Judge Ferrara," On what grounds are you denying my constitutional right to file a 330.30 motion? ".

242.     Adjourning the sentencing hearing didn't cost the city nor the state any more money nor harm anyone. The Plaintiff was already incarcerated. Judge Ferrara made a personal decision rather than a legal decision to deny the Plaintiff the legal right to file a 330.30 motion.

243.     The following action and colloquy ensued between Judge Ferrara and the Plaintiff in open court that concluded the sentencing hearing:

    **Plaintiff**: On what grounds your honor, I am a bit confused as to the grounds you refuse to adjourn the sentencing hearing so that I can file a 330.30 motion?

    Judge Ferrara stood up in open court and stated

    **Judge Ferrara:** BECAUSE I AM THE JUDGE!!!! (Emphasis required)

244.     At sentencing, the following transpired:

    A. On December 30, 2013, the Plaintiff requested that sentencing be adjourned so that he could prepare and submit a CPL 330.30 Motion to set aside the verdict. This Motion is to be reviewed and considered by the Court prior to sentencing.

    B. Judge FERRARA denied the Plaintiff's request for adjournment stating the Plaintiff had enough time to prepare the motion while he was in incarcerated.

    C. The Plaintiff explained to Judge Ferrara that during the time he was incarcerated he was studying post conviction relief and that he needs all the minutes to prepare the motion.

    D. The Plaintiff further explained that on December 10, 2013 he prepared a typed letter directed to the courts stating he needed the sentencing hearing to be adjourned in order to prepare the 330.30 motion. The Plaintiff further explained that he informed Mr. Altman prior to typing up the letter that he was

looking to file the 330.30 motion and that when he was done typing the letter he
wanted Mr. Altman to file the letter with the courts and DA's office.

E.  Mr. Altman failed to defend the Plaintiff's explanation and  as a result Judge
Ferrara stated his decision was final.

F.  The Plaintiff had enough of Kangaroo Court and Judge  Ferrara's abuse of
power and subjective decisions that he protested that this was abuse of power.

G.  Judge Ferrara ordered the Court Officers to silence the Plaintiff during
allocution.  As a result, defendant SAL Doe assaulted the Plaintiff, dragged him
across the courtroom, down to the holding cell and as a result the Plaintiff
sustained injuries and was diagnosed with handcuff neuropathy.

H.  The Plaintiff was then brought back into court to be sentenced.  Prior to being
sentenced, the Plaintiff, acting confused to test Judge Ferrara again, asked him
on what grounds he was denying him the right to file the 330.30 motion.

I.  The following event completely shocked the Plaintiff.  Judge Ferrara stood up
in open court and stated "BECAUSE I AM THE JUDGE!!!!!".

J.  The Plaintiff then proceeded to curse Judge Ferrara out multiple times
challenging him to hold him in contempt.

K.  The Plaintiff was sentenced to 6 months and then escorted out of the courtroom.

L.  The next scheduled hearing was set for January 31, 2014.


245.    Upon the conclusion of the sentencing hearing, Defendant DALEY and Defendant SAL
Doe escorted the Plaintiff from the courtroom to the vestibule,  outside the courts, by the
holding cell area, where Defendant Jane Doe  was still commanding her post, without any
excessive force being applied,


246.    The Plaintiff adamantly requested to see a doctor and to receive medical treatment for his
left hand.


247.    Defendant DALEY and Defendant SAL Doe escorted the Plaintiff downstairs to the DOC
bullpen. This time the Plaintiff was not dragged down through the use of excessive force but was
allowed to walk down the stairs freely, facing forward.

248.     By the bullpen, Correction Officer Pratts and an unidentified correction officer argued
back and forth with Defendant DALEY and Defendant SAL Doe that the injury that the Plaintiff
sustained was not during the time the Plaintiff was in the custody of the Department of
Corrections and thus the medical treatment he would require would have to go through the
Courts jurisdiction.

249.     Defendant DALEY and Defendant SAL Doe finally gave up arguing their position and
escorted the Plaintiff back upstairs and placed the Plaintiff in the courts' holding cell.

250.     On information and belief Defendant DALEY and Defendant SAL Doe  went back into
the courtroom in search for  their supervisor to help facilitate and  solve their predicament.

251.     Upon the aforementioned defendants' departure, the Plaintiff initiated a conversation
with Defendant Jane Doe.

252.     The Plaintiff got straight to the point and questioned Defendant Jane Doe and asked her
why she didn't intervene when she witnessed firsthand the assault and battery committed by her
co-worker Defendant SAL Doe.

253.     Defendant Jane Doe's response to the Plaintiff came to him as no surprise. Similarly, just
like the NYPD Blue Line, Defendant Jane Doe refused to cross the Unified Court System "Blue
Line". Her response was she wasn't going to risk her job and report another officer.

254.     Approximately 10 minutes later, Defendants SAL Doe, DALEY and Jane Joe entered the
vestibule.

255.     Defendants SAL Doe and  DALEY  informed Defendant Jane Joe  that the Department
of Correction refused to take the Plaintiff and provide him medical attention since the injury
occurred when the Plaintiff was in the custody of the courts.